**SIGNED THIS: March 22, 2012**

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: ) | |
| ) | |
| DAVID L. DUCKWORTH, ) | Case No. 10-83603 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| STATE BANK OF TOULON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Adv. No. 11-8002 |
| ) | |
| CHARLES E. COVEY, Trustee, MICHLIG ) | |
| AGRICENTER GRAIN, LLC, MICHLIG ) | |
| AGRICENTER, INC., RURAL COMMUNITY ) | |
| INSURANCE AGENCY, INC., a Minnesota ) | |
| corporation, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| ) | |
| CHARLES E. COVEY, Trustee, ) | |
| ) | |
| Cross-Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| MICHLIG AGRICENTER GRAIN, LLC, ) | |

| | |
|---|---|
| and RURAL COMMUNITY INSURANCE AGENCY, INC., a Minnesota corporation, | )<br>)<br>) |
| Cross-Defendants. | ) |
| | ) |
| CHARLES E. COVEY, Trustee, | ) |
| Counter-Plaintiff, | ) |
| vs. | ) |
| STATE BANK OF TOULON, | ) |
| Counter-Defendant. | ) |
| CHARLES E. COVEY, Trustee, | ) |
| Third-Party Plaintiff, | ) |
| vs. | ) |
| RURAL COMMUNITY INSURANCE COMPANY, a Minnesota corporation, KENNETH J. MEYER, NANCY A. MEYER, DONALD DUCKWORTH, DELORES DUCKWORTH, ENDRESS FARMS, INC., DENNIS ENDRESS, LUCILLE ENDRESS, JAMES KUNTZ, PETER C. JOHN, ROBERT GILLESPIE, CAROLYN GILLESPIE, JIM VIERLING, LARRY L. ENDRESS, REBECCA J. ENDRESS, MICHLIG AGRICENTER, INC., and DONALD R. DUCKWORTH, as Trustee of The Donald Duckworth Living Trust dated September 9, 1996, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Third-Party Defendants. | ) |

## **O P I N I O N**

This matter is before the Court on a Motion for Partial Summary Judgment filed by the Plaintiff, State Bank of Toulon (SBT) and a Motion for Partial Summary Judgment filed by one of the Defendants, Charles E. Covey (TRUSTEE), as chapter 7 trustee for the estate

2

of the Debtor, David L. Duckworth (DEBTOR). SBT asks the Court to determine that it has a first priority security interest in proceeds from the sale of certain farm products, equipment and crop insurance. The TRUSTEE filed a counterclaim to avoid SBT's security interest and seeks summary judgment on that claim. SBT seeks cross-summary judgment on those same counts of the TRUSTEE'S counterclaim.

**FACTUAL BACKGROUND**

The DEBTOR, a farmer, filed a chapter 7 petition on November 23, 2010. The parties agree that the TRUSTEE is holding the sum of $22,284.27 from the postpetition sale of certain farm equipment, the sum of $363,135.58 from the sale of the 2010 crop, and the sum of $223,604.80 from the sale of grain grown during previous crop years.

In December, 2008, the DEBTOR obtained a large loan from SBT, signing a Promissory Note evidencing an open-end revolving line of credit loan of $1,100,000 with fixed rate interest at 5.75%. The Note requires a single, interest-only payment due on April 1, 2009, with payment of the entire balance due on April 1, 2010. The Note states "Date of Note: December 15, 2008" and "Loan Date 12-15-2008." It identifies the governing law as Illinois law. On the second page of the Note, in the paragraph headed "collateral," it provides as follows:

> Borrower acknowledges this Note is secured by SECURITY AGREEMENT DATED DECEMBER 13, 2008 AND A MORTGAGE FROM DONALD R. DUCKWORTH, AS TRUSTEE OF THE DONALD R. DUCKWORTH LIVING TRUST TO THE STATE BANK OF TOULON DATED DECEMBER 15, 2008.[1]
> (Emphasis in original).

---

[1] The Note is identified as a form supplied by LASER PRO Lending. The first seven words of the quoted provision appear to be part of the printed form; the capitalized words appear to be transaction-specific that were, presumably, added at the direction of some SBT employee.

The DEBTOR also signed an Agricultural Security Agreement (ASA) dated December 13, 2008.[2] It identifies the "Loan Date" as "12-13-2008," but the boxes at the top of the first page for "Principal," "Maturity," "Loan No." and "Call/Coll" are all blank. The box for "Account" bears the number "406021," the same number set forth on the Promissory Note in the box for "Account."

The ASA describes the collateral as "All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, Crops, Farm Products, Livestock (including all increase and supplies) and Farm Equipment."[3] Near the top of its first page, the ASA provides that a security interest in the collateral is granted "to secure the Indebtedness." The word "Indebtedness" is defined on page 6 of the ASA as follows:

> The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

The word "Note" is also a defined term, as follows:

> The word "Note" means the Note executed by DAVID L. DUCKWORTH in the principal amount of $ _____ (sic) dated December 13, 2008, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

The term "Related Documents" is also a defined term, as follows:

> The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

---

[2]Like the Promissory Note, the Agricultural Security Agreement is also a form supplied by LASER PRO Lending. It is a 6-page document printed in small-font, single-spaced type. The Court estimates that it contains close to 10,000 words.

[3]This pleasantly concise description is immediately undermined by nine (9) lengthy paragraphs of supplemental collateral description that may be described as an endless recitation of redundant overkill that would make even the most persnickety lawyer blush.

4

The ASA provides that it is governed by Illinois law. It also contains an integration clause stating "This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement."

The ASA permits the DEBTOR to sell his crops, but requires the proceeds of any sale to be made immediately available to SBT in a joint check. (ASA p.2 under Sale of Collateral). The DEBTOR is required to give SBT a written schedule of the buyers or intermediaries to or through whom the grain may be sold. The DEBTOR provided a Schedule of Buyers dated December 13, 2008, identifying Akron Services, Inc., Michlig AgriCenter, Inc. (MICHLIG), and Rumbold & Kuhn, Inc.[4]

A number of other documents were generated as part of the DEBTOR'S loan transaction with SBT, including:

- a UCC Financing Statement identifying SBT as the Secured Party, containing a lengthy description of the collateral, stamped received by the Illinois Secretary of State's office on December 15, 2008.

- two documents entitled "Notice to Buyer of Security Interest in Farm Products" directed to MICHLIG providing notice of SBT's security interest in crops grown by the DEBTOR, given pursuant to the Federal Food Security Act of 1985, the first executed by SBT on December 15, 2008, and by MICHLIG acknowledging receipt on December 17, 2008, and the second by SBT on September 3, 2009.

- an "Agreement to Provide Insurance" dated December 13, 2008, evidencing the DEBTOR'S agreement to purchase insurance to protect SBT's interest in collateral, including crops. The Agreement identifies the "Loan Date" as "12-13-2008."

A second loan transaction between the DEBTOR and SBT occurred in January, 2010. The DEBTOR signed a Promissory Note in the amount of $950,000 dated January 29, 2010, evidencing an open-end line of credit for the purpose of paying "farm operating expenses

---

[4]For purposes of this Opinion, the reference to "MICHLIG" includes Michlig AgriCenter, Inc. and Michlig AgriCenter Grain, LLC, related entities whose distinction is immaterial as far as the issues addressed herein are concerned.

5

only," with full payment due on July 1, 2010. The paragraph headed "Collateral" provides that "Borrower acknowledges this Note is secured by SECURITY AGREEMENT DATED DECEMBER 13, 2008."

Thereafter, the DEBTOR granted a security interest to MICHLIG, signing a Commercial Security Agreement dated November 5, 2010, granting a security interest to secure "All Debts." The collateral description includes crops and proceeds from crop insurance. The record contains no notes or any other written evidence of the indebtedness referred to in the Agreement as "All Debts." On that same day, November 5, 2010, the DEBTOR executed a series of documents assigning to MICHLIG his rights under two crop insurance policies issued by Rural Community Insurance Services (RCIS), referred to as Policy 15 and Policy 16, both purporting to cover crop year 2010.

## ARGUMENTS OF THE PARTIES

The TRUSTEE and MICHLIG first contend that SBT's attempt to obtain a security interest in the DEBTOR'S assets in December, 2008, was invalid because the ASA provides that it secures a debt evidenced by a Note that does not exist, dated December 13, 2008, whereas the $1.1M Note is actually dated December 15, 2008. They argue that the four corners rule applies to the ASA so that parol evidence is inadmissible to correct the error.

SBT contends that the Court may look beyond the four corners of the ASA to identify what debt is secured. SBT submits the declaration of the loan officer, Douglas J. Blunier, who says he prepared all of the loan documents and personally closed the loan with the DEBTOR on December 15, 2008, at which time the DEBTOR signed the ASA and the $1.1M Note, whereupon SBT disbursed $1,099,553.50 on the Note. SBT characterizes

6

the date discrepancy and the omission of the principal amount in the ASA's definition of "Note" as a "clerical error."

SBT argues that it is not necessary for a security agreement to identify the date or amount of a secured note in order to be effective under 810 ILCS 5/9-203(b). The TRUSTEE and MICHLIG argue that once a lender attempts to identify the secured debt in the security agreement, it must do so correctly. By using the wrong date, they contend, SBT secured a debt that does not exist, thereby defeating the value requirement of UCC § 5/9-203(b), and is stuck with this result since the ASA's integration clause precludes parol evidence from correcting the error. SBT maintains that the error is correctable via parol evidence since Illinois adheres to the principle that documents executed as part of a single transaction are interpreted together as one contractual agreement, citing *Tepfer v. Deerfield Sav. & Loan Ass'n,* 118 Ill.App.3d 77, 454 N.E.2d 676 (Ill.App. 1 Dist. 1983).

## JURISDICTION

The parties agree that this matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(K) because it involves the determination of the validity, extent, or priority of liens. It is also a matter concerning the TRUSTEE'S administration of the estate and involves the allowance or disallowance of claims against the estate, so it is core under 28 U.S.C. § 157(b)(2)(A) and (B) as well.

## ANALYSIS

As a federal court applying Illinois law, this Court must attempt to predict how the Illinois Supreme Court would decide the issue. *Allen v. Transamerica Ins. Co.,* 128 F.3d 462, 466 (7th Cir. 1997). Where the Illinois Supreme Court has not ruled on an issue, decisions

of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently. *Id.* In the absence of Illinois judicial decisions, decisions from other jurisdictions may be consulted for guidance. *Pisciotta v. Old Nat. Bancorp,* 499 F.3d 629, 635 (7th Cir. 2007). Consulting decisions from other jurisdictions is especially appropriate when a uniform law is at issue, such as the Uniform Commercial Code, and those decisions are treated as highly persuasive. *In re Pillowtex, Inc.,* 349 F.3d 711, 718 n.8 (3rd Cir. 2003); *Lake Motor Freight, Inc. v. Randy Trucking, Inc.,* 118 Ill.App.3d 626, 631, 455 N.E.2d 222, 226 (Ill.App. 1 Dist. 1983). Courts may also consult a variety of other sources, including analogous decisions, considered *dicta,* and scholarly works. *Pisciotta,* 499 F.3d at 635.

It is important to point out at the outset that the issues as to the ASA are being litigated in a declaratory judgment action. That is the form of relief pleaded by SBT and upon which it seeks summary judgment. It is also the form of relief pleaded by the TRUSTEE and upon which he seeks summary judgment. In the alternative, the TRUSTEE seeks avoidance of SBT's security interest under 11 U.S.C. § 544(a)(1) and (a)(2). As explained below, those claims are precluded by the Court's determination that the ASA is valid and enforceable.

Despite the tome-like length of the ASA, the statutory requirements for a security agreement are few and simple. "Security agreement" simply means "an agreement that creates or provides for a security interest." 810 ILCS 5/9-102(a)(73). No particular form or special language is required. The agreement need only be in a writing signed by the debtor that describes the collateral. 810 ILCS 5/9-203(b)(3)(A). The general effectiveness

of a security agreement is addressed in section 9-201 of the Uniform Commercial Code (UCC), as adopted in Illinois, as follows:

> Except as otherwise provided in the Uniform Commercial Code, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors.

810 ILCS 5/9-201(a).

The requirements for a security agreement to be enforceable against the borrower and against third parties are only three, provided in section 9-203, as follows:

> (b) Enforceability. Except as otherwise provided in subsections (c) through (i), a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
>
> (1) value has been given;
>
> (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
>
> (3) one of the following conditions is met:
>
> > (A) the debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;
> >
> > (B) the collateral is not a certificated security and is in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement;
> >
> > (C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8-301 pursuant to the debtor's security agreement; or
> >
> > (D) the collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under Section 7-106, 9-104, 9-105, 9-106, or 9-107 pursuant to the debtor's security agreement.

810 ILCS 5/9-203.

The TRUSTEE and MICHLIG concede that the second and third requirements are satisfied. They dispute the first requirement, that value has been given, contending that the mistaken date of the December, 2008 Note means that value was not given. The evidence in the record is uncontradicted, however, that SBT disbursed the sum of $1,099,553.50 to the DEBTOR on December 15, 2008.[5] (Blunier Declaration). The Court determines, as a matter of fact, that value was provided by SBT to the DEBTOR. So all three statutory requirements for enforceability of the ASA are satisfied.

Once those conditions are met, the issue of enforceability is resolved. A mistake in the description of the secured debt does not render an otherwise valid security agreement unenforceable. Despite the mistake as to the date of the Note, the ASA was valid and enforceable by SBT against the DEBTOR. According to the plain terms of sections 9-201 and 9-203, a security agreement that is effective and enforceable against the debtor, is likewise effective and enforceable against third parties as well. Of course, a third party who can prove that he in fact relied upon and was misled by an incorrect representation in a security agreement, may prevail in a priority dispute. *F.S. Credit Corp. v. Shear Elevator, Inc.*, 377 N.W.2d 227, 231 (Iowa 1985). But that is not a challenge to the basic validity or enforceability of a security agreement, which is all that is at issue here, as MICHLIG does not claim to have been misled and the TRUSTEE, at least in a declaratory judgment action such as this, is not asserting the rights of a hypothetical creditor.

The parties devote a substantial portion of their briefs to arguments about whether the ASA is ambiguous and whether parol evidence is admissible to prove the true intent

---

[5]Value is defined to include "the extension of immediately available credit." 810 ILCS 5/1-201(44)(a).

10

of the DEBTOR and SBT.[6] Extrinsic proof of the secured debt is admissible whether or not the ASA is determined to be ambiguous. Illinois law is clear that the parol evidence rule applies only when the parties to a contract are litigating its meaning. When litigation involves a dispute over the meaning of a contract that is raised by a third party, parol evidence is admissible. *Northern Assur. Co. v. Chicago Mut. Bldg. Ass'n,* 198 Ill. 474, 64 N.E. 979 (1902); *Quality Lighting, Inc. v. Benjamin,* 227 Ill.App.3d 880, 887, 592 N.E.2d 377 (Ill.App. 1 Dist. 1992); *Rittenhouse v. Tabor Grain Co.,* 203 Ill.App.3d 639, 561 N.E.2d 264, 271 (Ill.App. 4 Dist. 1990); *General Cas. Co. of Wisconsin v. Elam,* 8 Ill.App.3d 215, 225, 289 N.E.2d 699 (Ill.App. 5 Dist. 1972). *See, also, Kaplan v. Shure Bros., Inc.,* 266 F.3d 598, 606 (7th Cir. 2001); *In re S.M. Acquisition Co.,* 296 B.R. 452, 466 (Bankr.N.D.Ill. 2003), *aff'd* 2005 WL 6292653 (N.D.Ill. 2005). So under Illinois law, in this dispute between SBT, a party to the ASA, and two nonparties, the TRUSTEE and MICHLIG, the parol evidence rule does not exclude extrinsic evidence of the actual debt that the DEBTOR and SBT intended to be secured.[7]

So the ASA is effective to secure the $1.1M Note and is enforceable against the DEBTOR and third parties. SBT argues that it also secures the second Note, dated January 29, 2010, in the amount of $950,000. SBT does not contend that the ASA identifies that later loan, so the issue is whether the ASA contains a provision for securing future debts. Future

---

[6]The TRUSTEE and MICHLIG rely heavily on *Matter of Martin Grinding & Mach. Works, Inc.,* 793 F.2d 592 (7th Cir. 1986), holding that parol evidence will not be permitted to enlarge the description of collateral in an unambiguous security agreement, one of many cases dealing with collateral description errors. Its holding does not govern the outcome in the case at bar.

[7]Even in litigation between two parties to a contract, parol evidence is admissible where a party alleges a mutual mistake. *Beynon Bldg. Corp. v. National Guardian Life Ins. Co.,* 118 Ill.App.3d 754, 455 N.E.2d 246 (Ill.App. 2 Dist. 1983); *Land of Lincoln Sav. & Loan v. Michigan Ave. Nat. Bank of Chicago,* 103 Ill.App.3d 1095, 432 N.E.2d 378 (Ill.App. 3 Dist. 1982).

advances or dragnet clauses are expressly permitted by § 9-204(c).[8] 810 ILCS 5/9-204(c). As amended in 2001, that statute's new initial phrase "A security agreement may provide," emphasizes that a future advances provision, while optional, must be set forth in writing as part of the security agreement in order for the security interest to cover debts not expressly identified therein. That proposition has always been true under the UCC. *See* Grant Gilmore, *Security Interests in Personal Property,* § 35.5 (1965); *Texas Kenworth Co. v. First Nat. Bank of Bethany,* 564 P.2d 222 (Okla. 1977); *John Miller Supply Co., Inc. v. Western State Bank,* 55 Wis.2d 385, 199 N.W.2d 161 (1972). Dragnet clauses are enforceable under Illinois law, if expressed in a security agreement in unambiguous terms. *Metropolitan Life Ins. Co. v. American Nat. Bank & Trust Co.,* 288 Ill.App.3d 760, 767-69, 682 N.E.2d 72 (Ill.App. 1 Dist. 1997); *Universal Guar. Life Ins. Co. v. Coughlin*, 481 F.3d 458, 463 (7th Cir. 2007). But this ASA, despite its incredible verbosity, does not contain such a provision.

SBT argues that the relevant definitional terms, carefully read, reflect an intent to secure all debts and thus may be construed to have the effect of a dragnet provision. MICHLIG argues that the definitions are circular, all eventually referring back to the nonexistent December 13, 2008 Note. The definition of "Indebtedness" covers that misidentified instrument and "Related Documents." "Related Documents" includes all notes, agreements and other instruments *executed in connection with the Indebtedness.* The definition of "Indebtedness" includes "all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this

---

[8]The terms "future advances clause" and "dragnet clause" are sometimes used interchangeably. As a matter of precision, a future advances clause would cover debts that postdate the security agreement, whereas a dragnet clause would cover all of the borrower's debts to the lender no matter when incurred. Synonymous terms include "cross-collateral" and "cross-security" clauses.

12

Agreement or under any of the Related Documents." SBT argues that the words "all other indebtedness" are expansive. This Court disagrees. Those words are modified by the final two clauses: "for which Grantor is responsible under this Agreement or under any of the Related Documents." Those clauses operate to limit the covered indebtedness to the December, 2008 loan and none other. The Court agrees with MICHLIG that the definitions are circular and do not, by their plain terms, encompass any future debts. The January, 2010 Note is not secured by the ASA.

It also follows that the failure to contain a future advances or dragnet clause cannot be overcome by simply referring to the security agreement in a different instrument. A future advances or dragnet clause is the statutorily mandated mechanism by which debts not referred to in a security agreement may be secured thereby. *Cf. Turner Const. Co. v. Midwest Curtainwalls, Inc.,* 187 Ill.App.3d 417, 421, 543 N.E.2d 249 (Ill.App. 1 Dist. 1989) (under general contract law principles, a contract may incorporate other documents by reference where such intent is expressed in the contract). The rule against securing unmentioned debts has the salutary effect of preventing secret liens. So the reference in SBT's January, 2010 Note to being collateralized by the ASA is ineffective to overcome the omission in the ASA of the necessary language that would permit it to secure obligations not specifically identified therein. *See Safe Deposit Bank & Trust Co. v. Berman,* 393 F.2d 401 (1st Cir. 1968) (if security agreements that on their face secure specific loans could be converted into open-ended security arrangements for future liabilities by recitals in subsequent notes, much needless uncertainty would be introduced into modern commercial law).

As an alternative to the declaratory judgment cause of action, the TRUSTEE seeks to avoid SBT's claimed interest using the avoiding powers accorded by section 544(a)(1) and (a)(2) and to preserve the avoided lien rights under section 551 for the benefit of the estate. This avoidance action is premised upon the alleged invalidity of the ASA due to its mistaken recitation of the date of the note. Having determined that the ASA was valid and enforceable, the TRUSTEE'S section 544 claim fails. Even if the Court had determined that no security interest was validly created, there would have been no lien to preserve so the TRUSTEE could not have used section 551 to the detriment of MICHLIG or any other secured creditor. *See In re Seibold,* 351 B.R. 741 (Bankr.D.Idaho 2006); *In re McCorhill Pub., Inc.,* 86 B.R. 783 (Bankr.S.D.N.Y. 1988).

The declaratory judgment in favor of SBT does not entirely resolve the pending motions. The TRUSTEE and MICHLIG contend that SBT does not have an enforceable security interest in the crop insurance proceeds. SBT asserts that the ASA's description of the collateral covers the insurance proceeds. The ASA's lengthy recitation of all that is included in the term "Collateral" refers to crops, proceeds and insurance proceeds. SBT's financing statement also refers to insurance proceeds. Apparently conceding that SBT's collateral description is adequate, the TRUSTEE and MICHLIG contend that SBT's attempt to obtain an Article 9 security interest in the crop insurance proceeds was ineffective because a federal statute provides the exclusive method for obtaining such an interest.

The parties have stipulated to the following facts. Two crop insurance policies were issued to the DEBTOR by Rural Community Insurance Agency, Inc. (RCIA), providing crop insurance under the federal program administered by the Federal Crop Insurance

14

Corporation (FCIC). The terms of both policies, referred to as Policy 15 and Policy 16, are, for our purposes, identical. Shortly before filing, the DEBTOR assigned to MICHLIG his rights under the policies by executing standard forms entitled "Assignment of Indemnity Application," granting MICHLIG "the right to submit the loss notices" and to be named as a joint payee with the DEBTOR on a joint check for any insurance proceeds (referred to as "indemnity payments") that the Approved Insurance Provider might decide to issue. RCIA issued a written acknowledgment of the assignments. The DEBTOR did not assign his insurance rights to SBT.

On the same day as the assignments, November 5, 2010, the DEBTOR executed a Commercial Security Agreement granting MICHLIG a security interest in certain collateral, including crop insurance proceeds. The parties also agree that prior to the bankruptcy filing, the DEBTOR "made an application for crop insurance proceeds on his policies with RCIA," but that no insurance proceeds have been paid.

The policies contain a paragraph governing "Assignment of Indemnity" that provides that the right to an indemnity is assignable and that the "assignment must be on our form and will not be effective until approved in writing by us." The TRUSTEE and MICHLIG contend that as to unpaid crop insurance proceeds, an assignment accepted by a federal crop insurer is the exclusive method by which a creditor may obtain an interest in the insurance proceeds.

This issue has not been addressed by the Supreme Court or the Court of Appeals for the Seventh Circuit. The Fifth Circuit addressed it in *In re Cook,* 169 F.3d 271 (5th Cir. 1999), framing the primary issue as whether UCC Article 9 is preempted by the Federal Crop

15

Insurance Act (FCIA), 7 U.S.C. §§ 1501 *et seq.*[9]  The court began its analysis by noting that the FCIA expressly provides for federal preemption in section 1506, which provides:

> The Corporation may enter into and carry out contracts or agreements, and issue regulations, necessary in the conduct of its business, as determined by the Board. State and local laws or rules shall not apply to contracts, agreements, or regulations of the Corporation or the parties thereto to the extent that such contracts, agreements, or regulations provide that such laws or rules shall not apply, or to the extent that such laws or rules are inconsistent with such contracts, agreements, or regulations.

7 U.S.C. § 1506(l).

The insurance policy at issue in *Cook* contained identical language to Policy 15 and Policy 16, permitting assignment of indemnity rights only via the authorized form and subject to the agent's written approval. The Fifth Circuit relied upon several provisions in the FCIA regulations, to the effect that preemption is intended with respect to both the imposition and enforcement of liens (citing 7 C.F.R. § 400.352), that an interest in an insured crop existing by virtue of a lien does not entitle the lienholder to any benefit under the contract (citing 7 C.F.R. § 401.5), and that while a debtor may assign the right to indemnity, the assignment must be on FCIC's form and will not be effective until approved in writing by FCIC (citing 7 C.F.R. § 401.8).

The Fifth Circuit held that, with respect to undisbursed proceeds, the FCIA preempted state law with respect to the method by which a lien on an insured's right to proceeds under a federal crop insurance policy may be created. Thus the exclusive method

---

[9]The FCIA was originally passed in 1938, and created the FCIC. It was amended significantly in 1980 with the intention to dramatically increase the amount and availability of crop insurance to the nation's farmers. The 1980 amendments authorized the use of private insurance agents to aggressively market and sell policies. *See Horn v. Rural Community Ins. Services,* 903 F.Supp. 1502, 1505 (M.D.Ala. 1995).

16

by which a creditor might obtain a lien or interest in undisbursed proceeds is through the authorized assignment process. This Court agrees with the holding and reasoning of the Fifth Circuit.

**Conclusion**

SBT made two loans to the DEBTOR evidenced by a $1.1M Note dated December 15, 2008, and a $950K Note dated January 29, 2010. The ASA does not specifically identify either Note as being secured. Parol evidence is admissible to prove the mistake in the date of the described note and the fact that the parties intended the ASA to describe, and thus secure, the $1.1M Note dated December 15, 2008. The ASA does not contain a future advances or dragnet provision, without which the January 29, 2010 Note is unsecured.

The parties have stipulated that as of the petition date, the balance due SBT on the December, 2008 Note was $1,137,090.28. They have stipulated that the TRUSTEE is holding deposited sums of $363,135.58 representing the net proceeds of 2010 crops, $223,604.80 representing proceeds from the sale of grain grown during unspecified crop years (presumably prior to 2010), and $22,284.27 representing proceeds from the sale of a bulk seed buggy, corn head chains and a Sulford ripper.

The TRUSTEE and MICHLIG do not dispute that the ASA adequately describes farm equipment as collateral. Thus, now that the ASA has been determined to be valid, it is undisputed that SBT's lien extends to the proceeds from the sale of the farm equipment. So the TRUSTEE should be ordered to turn over to SBT the $22,284.27 in equipment proceeds.

There is also no dispute that the ASA's collateral description covers crops and crop

proceeds. The Stipulation of Facts, however, indicates that MICHLIG claims a priority setoff right as to $35,873.96 of the 2010 crop proceeds. SBT's motion also acknowledges the pendency of unresolved priority landlord lien claims, in an undetermined amount, against the crop proceeds. Because of these unresolved priority claims, the TRUSTEE should continue to hold the crop proceeds.

It is further determined that SBT has no lien against the crop insurance policies or the undisbursed proceeds thereunder. It is futher determined that the TRUSTEE'S claims for avoidance under sections 544(a)(1) and (a)(2) should be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###